**14-14943-cv**

IN THE

# United States Court of Appeals

## FOR THE ELEVENTH CIRCUIT

◆—◆

WAREHOUSE SOLUTIONS, INC.,

*Plaintiff-Counter Defendant-Appellant,*

—v.—

INTEGRATED LOGISTICS, LLC, Individually, DAN WOTRING, Individually,
DAVID IVIE, Individually, MICHAEL HEYDEN, Individually,

*Defendants-Counter Claimants-Third Party Plaintiffs-Appellees,*

SCOTT LANGLEY,

*Third Party Defendant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

---

### BRIEF FOR PLAINTIFF-COUNTER DEFENDANT-APPELLANT

---

TODD E. JONES
AMANDA GROOVER HYLAND
SETH KINCAID TRIMBLE
TAYLOR ENGLISH DUMA, LLP
1600 Parkwood Circle, Suite 400
Atlanta, Georgia 30339
(700) 434-6868

*Attorneys for Plaintiff-Counter
Defendant-Appellant*

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

## No. 14-14943-C

### WAREHOUSE SOLUTIONS, INC.,

**Plaintiff/Appellant,**

v.

### INTEGRATED LOGISTICS, LLC, *et al.*,

**Defendants/Appellees,**

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

## CERTIFICATE OF INTERESTED PERSONS AND
## CORPORATE DISCLOSURE STATEMENT

**Todd E. Jones**
Georgia Bar No. 403925
tjones@taylorenglish.com
**Amanda G. Hyland**
Georgia Bar No. 325115
ahyland@taylorenglish.com
TAYLOR ENGLISH DUMA, LLP
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339
Phone: (770) 434-6868
Facsimile: (770) 434-7376

**ATTORNEYS FOR APPELLANT WAREHOUSE SOLUTIONS, INC.**

*Warehouse Solutions Inc. v. Integrated Logistics, LLC et al.*

Under Fed. R. App. 26.1 and 11th Cir. R. 26.1, Appellant Warehouse Solutions, Inc. certifies that the following is a full and complete list of all trial judge(s), all attorneys, persons, associations of persons, firms, partnerships, or corporations that have an interest in the outcome of this particular case or appeal, including subsidiaries, conglomerates, affiliates and parent corporations, including any publicly held corporation that owns 10% or more of the party's stock, and other identifiable legal entities related to a party:

Aaron Scott Langley

Alexander T. Galloway III

Amanda Hyland

Angela H. Smith

Daniel Wotring

David Ivie

Gregory Philmon

Hannah Testani

Integrated Logistics, LLC

James Hamilton

Joseph Lebovich

Judge Harold L. Murphy

Judge Robert L. Vining

Lamar Whitley

Michael Heyden

Nicholas R. Perrella

Platinum Circle Holdings, LLC

Platinum Circle Technologies, LLC

Seth K. Trimble

Taylor English Duma LLP

Todd E. Jones

Warehouse Solutions, Inc.

Respectfully submitted this 18th day of November, 2014,

*/s/ Amanda G. Hyland*
Amanda G. Hyland
Georgia Bar No. 325115
ahyland@taylorenglish.com

**TAYLOR ENGLISH DUMA LLP**
1600 Parkwood Circle, Suite 400

Page C-**3** of **4**

*14-14943-C*

*Warehouse Solutions Inc. v. Integrated Logistics, LLC et al.*

Atlanta, Georgia 30339
Phone: (770) 434-6868
Facsimile: (770) 434-7376

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing document using the

CM/ECF system, which will send notification of such filing to all attorneys of

record.

*/s/ Amanda G. Hyland*

## STATEMENT REGARDING ORAL ARGUMENT

Appellant Warehouse Solutions, Inc. believes that oral argument may be helpful to aid the Court in resolution of any issues presented by the appeal.

## TABLE OF CONTENTS

PAGE

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE
    DISCLOSURE STATEMENT..........................................  C-1

STATEMENT REGARDING ORAL ARGUMENT .....................  i

TABLE OF AUTHORITIES ...............................................  iv

STATEMENT OF APPELLATE JURISDICTION.......................  1

INTRODUCTION........................................................  1

STATEMENT OF THE ISSUE ...........................................  4

STATEMENT OF THE CASE.............................................  5

I.   Course of the Proceedings and Disposition in the Case Below .....  5

II.  STATEMENT OF THE FACTS......................................  6

    A.  Intelligent Audit is a shipment-tracking program. ..............  6

    B.  Integrated Logistics needed new web-based shipment
        tracking software. ................................................  7

    C.  WSI took sufficient steps to secure Intelligent
        Audit's secrecy. .................................................  8

    D.  Integrated Logistics derived substantial economic
        value from access to WSI's software. ..........................  12

    E.  The District Court made improper factual findings
        and incorrectly relied on inapposite cases not
        discussed by the parties. .........................................  15

PAGE

III. STANDARD AND SCOPE OF REVIEW .............................. 18

IV. SUMMARY OF THE ARGUMENT ................................. 18

ARGUMENT AND CITATIONS OF AUTHORITIES ................... 22

I.   WSI presented sufficient evidence to create a jury
     question as to the reasonableness of its efforts to
     maintain confidentiality. ............................................ 22

     A.  Georgia law is clear that a trade secret's existence is
         a factual question and may be found even absent a
         written confidentiality agreement. ............................... 22

     B.  The District Court erred in concluding for itself that
         WSI's efforts to maintain secrecy were not reasonable
         under the circumstances. ........................................... 23

         1. The District Court erroneously usurped the role
            of the jury. ..................................................... 24

         2. The District Court ignored the confidentiality measures
            implemented by WSI. ......................................... 25

         3. The District Court failed to acknowledge WSI's infancy
            and unsophistication at the time it began dealings with
            Integrated Logistics. ......................................... 29

II.  Software features and functionality may be protectable
     trade secrets. ......................................................... 30

     A.  Software functionality and features may qualify for
         trade secret protection. ........................................... 30

     B.  The District Court's cited authorities are inapposite. ........... 34

CONCLUSION ............................................................ 40

CERTIFICATE OF COMPLIANCE ....................................... 42

iii

# TABLE OF AUTHORITIES

PAGE(S)

**Cases:**

*AirWatch LLC v. Mobile Iron, Inc.*,
   2013 U.S. Dist. LEXIS 125817
   (N.D. Ga. Sept. 4, 2013) ................................. 20, 31, 32, 33, 39

*Avnet, Inc. v. Wyle Labs.*,
   437 S.E.2d 302 (Ga. 1993) ..................................... 27, 28, 29

*B&G Enters., Ltd. v. United States*,
   220 F.3d 1318 (11th Cir. 2000) ..................................... 18

*Camp Creek Hospitality Inns v. Sheraton Franchise Corp.*,
   139 F.3d 1396 (11th Cir. 1998) ................................. 28, 29

*Deman Data Sys., LLC v. Schessel*,
   No. 8:12-cv-2580, 2014 WL 6751195 (M.D. Fla. Dec. 1, 2014) ... 33

*IDX Sys. Corp. v. Epic Sys. Corp.*,
   285 F.3d 581 (7th Cir. 2002) .......................... 16, 35, 36, 37, 39

*Outside Carpets v. Indus. Rug Co.*,
   228 Ga. 263 (1971) ................................................ 23

*Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*,
   318 F.3d 1284 (11th Cir. 2003) ................................... 22

*Salsbury Labs., Inc. v. Merieux Labs., Inc.*,
   908 F.2d 706 (11th Cir. 1990) ............................. 22, 23, 28, 29

*Sheets v. Yamaha Motors Corp.*,
   849 F.2d 179 (5th Cir. 1988) ................................... 22, 25

*Silvaco Data Sys. v. Intel Corp.*,
   184 Cal. App. 4th 210 (2010) ............................. 16, 37, 38, 39

*St. Charles Foods, Inc. v. America's Favorite Chicken Co.*,
   198 F.3d 815 (11th Cir. 1999) ..................................... 18

iv

PAGE(S)

*Thomas v. Best Manufacturing Corp.*,
234 Ga. 787, 218 S.E.2d at 71 (1975) ............................... 23, 28

*Thornton v. E.I. Du Pont de Numours & Co.*,
22 F.3d 284 (11th Cir. 1994) ........................................ 18

*TouchPoint Solutions, Inc. v. Eastman Kodak Co.*,
345 F. Supp. 2d 23 (D. Mass. 2004) ............................... 33, 34

*Tri-Tron International v. Velto*,
525 F.2d 432 (9th Cir. 1975) ...................................... 22, 25

*Whatley v. CNA Ins. Co.*,
189 F.3d 1310 (11th Cir. 1999) .................................... 18

*Wilson v. Barton & Ludwig*,
163 Ga. App. 721, 296 S.E.2d 74 (1982) ........................... 22

**Statutes:**

28 U.S.C. § 1331 .................................................... 1

28 U.S.C. § 1332 .................................................... 1

O.C.G.A. § 10-1-760 *et seq.* ....................................... 22

O.C.G.A. § 10-1-761(4) .............................................. 22, 30

**Rules:**

Fed. R. Civ. P. 54(b) ............................................. 1, 6

v

## STATEMENT OF APPELLATE JURISDICTION

Appellant WSI initiated this action in federal court pursuant to diversity jurisdiction under 28 U.S.C. § 1332. The Amended Complaint further alleged a federal question additionally creating jurisdiction under 28 U.S.C. § 1331.

The district court entered final judgment in this action on WSI's claim for trade secret misappropriation under Fed. R. Civ. P. 54(b).

## INTRODUCTION

In the late 1990s, a small family business called Warehouse Solutions, Inc. ("WSI") launched a novel web-based software program designed to help retailers track and optimize their product shipping and distribution.  WSI developed the technology, known as Intelligent Audit, and deployed a litany of technological measures to protect it.  Among other things, WSI required each customer to use a unique login and complex password, maintained those passwords using encryption, monitored the locations of all users accessing the product, and insisted that its customers acknowledge the confidentiality of Intelligent Audit through license agreements.

Like WSI, Appellee Integrated Logistics LLC ("Integrated Logistics") was also in the business of providing software to companies seeking to reduce their

1

shipping costs. Unlike WSI, however, Integrated Logistics lacked a *web-based* platform. Rather than seeking to buy or develop a web-based product of its own, Integrated Logistics turned to WSI. In 2002, the companies entered into an agreement whereby WSI provided Integrated Logistics with greater access to Intelligent Audit than ordinary customers received. Integrated Logistics agreed to pay WSI one and one-half cents for each transaction that WSI audited as a result of the arrangement. Integrated Logistics fully understood the proprietary and confidential nature of Intelligent Audit, and admitted as much under oath. Although WSI—a small family-run entity that lacked legal sophistication—did not require Integrated Logistics to sign a written confidentiality agreement, the law is clear that written agreements are not a prerequisite for trade secret protection.

Apparently unwilling to continue paying even a penny and a half per transaction, Integrated Logistics decided to cast WSI aside, but only after covertly and carefully duplicating WSI's product. Over a period of 15 months, Integrated Logistics hired a team of software developers and arranged for them to analyze Intelligent Audit, using the unprecedented access that Integrated Logistics was given under its agreement with WSI. Even without access to WSI's source code, Integrated Logistics had access to *all* of WSI's customer data for *all* of its customers, and leveraged this access to mimic the software's every feature,

2

function, and reporting capability. WSI's trust in Integrated Logistics was repaid with the total theft of its software, the loss of its royalties, and the wrongful entry of a knock-off product competing in a marketplace that it created.

WSI sued Integrated Logistics and its management for trade secret misappropriation, seeking injunctive and monetary relief. The district court, without hearing oral argument, granted Integrated Logistics' motion for summary judgment. Instead of assessing whether any genuine disputes of material fact existed, however, the District Court weighed the evidence and rendered its own factual "conclusions" with respect to key factual issues, namely whether WSI's software functionality and report generation features amounted to a trade secret and whether WSI had taken reasonable measures to preserve its confidentiality. The District Court also relied on two out-of-circuit cases never analyzed or cited by the parties in order to hold that the features and functionality of Intelligent Audit could not, as a matter of law, be protectable as trade secrets. This finding is not only unsupported by the cases the District Court invoked, which have little application to the technology at issue here, but creates a dangerous precedent that could severely impede the ability of small technology companies to maintain intellectual property rights in their products. This Court should reverse the summary judgment order and remand for trial.

3

## STATEMENT OF THE ISSUE

Whether the district court should have denied summary judgment in light of disputed factual questions as to (1) whether WSI took reasonable steps to maintain the confidentiality of its software, particularly in light of its small size and lack of sophistication, and (2) whether the functionality and report generation features of WSI's software are protectable trade secrets under the Georgia Uniform Trade Secrets Act.

## STATEMENT OF THE CASE

### I.    Course of the Proceedings and Disposition in the Case Below.

WSI commenced this action in 2009 in the District of New Jersey against Integrated Logistics and its co-owners Michael Heyden, David Ivie and Daniel Wotring.    In May 2011, the New Jersey court transferred this action to the Northern District of Georgia.    WSI's lawsuit sought recovery of damages and equitable relief resulting from Defendants' misappropriation of WSI's trade secrets and related claims.    Complaint at Dkt. 1, superseded by First Amended Complaint at Dkt. 78 (Appendix ("App") pp. 37-66).    On November 15, 2011, Integrated Logistics filed amended counterclaims against WSI asserting numerous causes of action.    Dkt. 39.

Following discovery, the parties filed cross-motions for summary judgment. In an order dated July 7, 2014, Judge Robert L. Vining, Jr. granted summary judgment for Integrated Logistics on all of WSI's claims, including its trade secret claim, and granted summary judgment for WSI on all but one of Integrated Logistics' counterclaims.    Dkt. 180.    On October 9, 2014, following a reassignment of the case to Judge Harold Murphy, the district court granted Integrated Logistics'

unopposed request for judgment under Federal Rule of Civil Procedure 54(b).  Dkt. 198-199.  On October 29, 2014, WSI filed a timely Notice of Appeal.  Dkt. 201.

## II.    STATEMENT OF THE FACTS

### A. Intelligent Audit is a shipment-tracking program.

In 1996, Joseph "Yosie" Lebovich launched a small logistics business, WSI, with the help of immediate family members.  App. 274-275 (citing Deposition of Joseph Lebovich ("Lebovich Dep.") App. 187).  Mr. Lebovich, who was born in the Ukraine, had moved to the United States at the age of 17 and graduated from Brooklyn College with a computer science degree. App. 274 (citing Lebovich Dep. App. 185-186).  In 1998, he created, developed, and launched Intelligent Audit.[1] App. 274 (citing Lebovich Dep. App. 187).  This software interfaced with UPS and FedEx tracking systems to assist companies in tracking their packages and collecting any money due to them related to late or missing packages.  App. 275 (citing Lebovich Dep. App. 188-190).  Intelligent Audit also runs over 100 different customer reports, performs e-bill audits, and allows customers to access and view up-to-the-minute, real-time data regarding their shipments.  App. 275

---

[1] The software program created and owned by WSI was sold under the names "WSTrack" and "Intelligent Audit."  When Integrated Logistics had access to WSTrack from 2002 to September 30, 2005, WSI permitted it to market and sell the product under the "ShipLink" name.  For purposes of this brief, the software will be referred to only as "Intelligent Audit."

6

(citing Deposition of Michael Heyden ("Heyden Dep.") App. 203-216). Today, WSI's Intelligent Audit technology is used by companies as diverse as Microsoft, TJ Maxx, Xerox, and Whirlpool.

### B. Integrated Logistics needed new web-based shipment tracking software.

Integrated Logistics also was in the business of providing software to end users for tracking packages and claiming late or undelivered package fees, and it called its software ShipLink. App. 275; App. 194-195. The ShipLink system was a rudimentary package tracking system that could not interface with the Internet. App. 275; (citing Heyden Dep. App. 196). In late 2002, the owners of Integrated Logistics determined that they needed a web-based platform to keep up with demand, but concluded that it would be "cost prohibitive" to create one in-house, and moreover, that Integrated Logistics did not have the expertise to do so. App. 275-276 (citing Heyden Dep. App. 200-201).

Accordingly, Integrated Logistics was eager to switch to a new web-based platform. In 2002, Integrated Logistics decided to partner with WSI in order to gain access to Intelligent Audit. WSI provided Integrated Logistics with access to the software, and Integrated Logistics agreed to pay WSI a penny and a half ($.015) per transaction that WSI audited as a result of the arrangement. App. 275-276 (citing Heyden Dep. App. 197-199, 202).

7

Not only did Integrated Logistics introduce its own customers to Intelligent Audit, but it also served as the account manager for the Integrated Logistics customers who used the software.  Lebovich Dep. App. 390-391.  WSI ultimately granted Integrated Logistics total access to the technology; unlike any other licensee or user of Intelligent Audit, Integrated Logistics had nearly the same level of access as Mr. Lebovich himself.  App. 391.

Integrated Logistics' high-level administrative access resulted in Integrated Logistics' ability to view to features and reports that end users could not see or manipulate.  App. 115.  Also unlike typical end users, Integrated Logistics could upload and adjust data and could also see what processing rules were applied to that data.  App. 393-394.

### C. WSI took sufficient steps to secure Intelligent Audit's secrecy.

In 2002, at the time Integrated Logistics arranged to provide Intelligent Audit to its customers, the software was securely protected behind the most technologically advanced password and encryption features available.  For example, Mr. Lebovich testified that WSI took over a dozen security measures to keep its product secret:

> 1.  Each user could log in to the web portal only with a unique user ID and password.

8

2.  New accounts were marked with temporary passwords that were
required to be changed when the user first logged in.

3.  Each user ID had to be at least two characters long, and the
associated password was required to contain letters and numbers and
be at least 8 characters long.

4.  The system would record a user's unique Internet Protocol ("IP")
address every time a user attempted to log into the system.

5.  The system would deny entry for ten minutes to any user that
entered three incorrect user ID / password combinations.

6.  Each password was stored under encryption.  The system would
encrypt any attempted password entries to compare them with the
stored encrypted passwords to determine if access should be granted.

7.  A user's account, including the user's password, could be set to
expire after a predetermined amount of time.  After a user's password
expired, the user could not reuse the same password.

8.  New user accounts could only be created by WSI employees with
administrative access to the system.

App. 276-277; citing Declaration of Joseph Lebovich ("Lebovich Dec.")

App. 226-228). WSI took even further steps—before, during, and after WSI

entered into its relationship with Integrated Logistics—to protect the

database containing Intelligent Audit data and operating system ("OS"):

9.  The data stored in the database was not directly accessible to end-
users at all.  Direct database access was only given to WSI employees
and, ultimately, Integrated Logistics pursuant to the parties'
arrangement.

9

10.  Access to the OS and source code was limited to WSI employees and contractors.

11.  The source code was maintained behind a firewall.

12.  Employee access to the OS and source code occurred via encrypted Secure Shell ("SSH") connections and over an encrypted Virtual Private Network ("VPN").

13.  End users were prevented from requesting large reports—specifically, the reports available to end-users had a limit on the maximum number of lines that could be exported—in order to prevent users from gleaning information about the inner workings of Intelligent Audit.

App. 277 (citing Lebovich Dec. App. 227-228).

Specifically with respect to Integrated Logistics, WSI took *additional*

security measures.

14.  Mr. Lebovich repeatedly told Appellees Ivie and Heyden that the Intelligent Audit software was highly confidential.

15.  At one point, when Appellee Heyden requested access to the database, WSI used Open Database Connectivity ("ODBC") to allow Mr. Heyden to see only the necessary data, but nothing outside the scope of his requests.

16.  Mr. Lebovich instructed Appellees not to share the software with anyone beyond Integrated Logistics who had not signed a license agreement that explicitly identified the technology as proprietary and confidential.

17.  WSI required Integrated Logistics to have all of its customers sign a contract that expressly forbade outside disclosure. Integrated Logistics' end users (referred to in the agreements quoted below as

10

"CLIENT") agree to or acknowledged confidentiality in at least three separate provisions:

> CLIENT shall limit access to the service and its outputs and PROVIDER Information to only those of CLIENT's employees, agents, and independent contractors having a bona fide need for such access.
>
> . . .
>
> PROVIDER information is proprietary to PROVIDER and disclosed to CLIENT solely for the purpose of facilitating the relationship described in the Agreement and the effectuation of services described hereunder, and CLIENT agrees (i) not to use and PROVIDER information for any purpose other than the foregoing, and (ii) to limit disclosure of PROVIDER Information to those employees . . . who have a need for such disclosures, subject to the user limit specified in Exhibit C, who are bound by restrictions regarding confidentiality that are no less stringent than CLIENT requires of such person or entity with respect to CLIENT's own proprietary and confidential information.
>
> . . .
>
> PROVIDER retains ownership of all rights, title and interest in and to the PROVIDER SOFTWARE . . . CLIENT acknowledges and agrees that the fees paid for access to the PROVIDER SOFTWARE are licensing fees granting CLIENT only the rights set forth in this agreement . . . .

App. 277-279; citing Deposition and related exhibit of Scott Langley ("Langley Dep.") (App. 232-244).

In light of this multitude of security measures, it is no surprise that the owners of Integrated Logistics clearly understood that Intelligent Audit was proprietary and confidential. When asked if he considered WSI's software to be

11

confidential, Mr. Ivie did not hesitate to answer "yes."

> Q: Would you consider [WSI's software] confidential
> information?
> A: Yes.
> Q: Okay.  And would you consider it proprietary?
> A: Yes.

Deposition of David Ivie ("Ivie Dep.") App. 271.

### D. Integrated Logistics derived substantial economic value from access to WSI's software.

In 2004, without WSI's knowledge or consent, Integrated Logistics decided to copy Intelligent Audit.  App. 280-281. Integrated Logistics co-owner Michael Heyden testified that he was uncomfortable not having "control" over the system. App. 217.   Integrated Logistics hired Platinum Circle Technologies, LLC ("Platinum") in 2004 to copy WSI's software in full in order to compete with Intelligent Audit. App. 280-281.

Integrated Logistics' President and co-owner David Ivie testified that, beginning in July 2004 and continuing to September 2005, his company gave unauthorized access to WSI's proprietary software to a team of approximately eight  individuals working with Platinum, for the purpose of copying as much of WSI's trade secrets and proprietary software system (then known as WSTrack) as possible in order to develop a software program that was identical to that owned by WSI—not just in appearance, but also in function:

12

> Q: So, in 2004, in 2005 the sole business of Platinum Circle Technologies was to develop the ShipLink web-based system?
> A: Yes . . .
> Q: And did you tell Mr. Hamilton that you wanted to build a system that looked just like WSI's system?
> A: To look similar, yes.
>
> . . .
>
> Q: Why did you pick October 1st, or September 30th of 2005 to terminate [Integrated Logistics'] relationship with WSI?
> A: [ShipLink] had the functionality we needed in order to continue servicing our customers.
> Q: Okay. And the system that Mr. Hamilton spent 15 or 16 months building could perform the same functions as WSI's web-based system, correct?
> A: And others, yes.
>
> . . .
>
> Q: So is it true, is it fair to say that the ShipLink system was tailored based upon the WSI system?
> A: To look like it, yes.
> Q: Okay, and to perform the same functions?
> A: . . . Yes.

App. 280-281 (citing Ivie Dep. App. 259-264, 267-268).

Mr. Ivie further confirmed that Integrated Logistics gave unauthorized access to WSI's proprietary software to Platinum and its employees via a password and user ID:

> Q: So you gave Mr. Hamilton a password and user identification to log into the system?
>
> A: I don't recall exactly who gave it or if it was using an existing one that we had that we were using, but he did have access to the system.

13

App. 281 (citing Ivie Dep. App. 262). Integrated Logistics concealed this activity

from WSI for 15 months:

> Q: And did you tell Mr. Lebovich that Mr. Hamilton had access to the system?
> A: No.
> Q: Why?
> A: Didn't see any reason to.
> . . .
> Q: And you never had a conversation with Mr. Lebovich telling Mr. Lebovich that you had given Platinum Technologies access to the system, correct?
> A: Correct.
> Q: Okay. So Mr. Lebovich never knew that Platinum Technologies has access to his system . . . from July 2004 up and through and including October 1st of 2005, correct?
> A: Correct.

App. 282 (citing Ivie Dep. App. 262, 266).

Finally, after 15 months of unauthorized access by Platinum and its

employees, Integrated Logistics acquired a software program duplicated by

Platinum that looked identical and functioned identically to WSI's software. App.

282. Other than two features Integrated Logistics did not fully understand, the new

software generated the same customer reports, performed the same e-bill audits,

and allowed customers to access and view up-to-the-minute, real-time data

regarding their shipments – exactly as Intelligent Audit did. Ivie Dep. at Dkt. 170

pp. 112-114.    The programs were also visually indistinguishable, such that

14

potential and existing Intelligent Audit customers commented to Mr. Lebovich that they looked identical. App. 282 (citing Plaintiff's Third Supplemental Responses to Defendants' Interrogatories App. 319-321).   Indeed, Integrated Logistics practically replicated WSI's Intelligent Audit user manual when it created its own user manual for the Integrated Logistics program.  Ivie Dep. at Dkt. 170 pp. 115-117.

On September 30, 2005, Integrated Logistics notified WSI that it was terminating its relationship with WSI without warning or advance notice.  App. 264.  Integrated Logistics then immediately began to compete with WSI using the product that it had copied.  App. 264.

### E. The District Court made improper factual findings and incorrectly relied on inapposite cases not discussed by the parties.

Upon learning of the theft of its software, WSI sued Integrated Logistics and its owners, stating (among others) a claim for trade secret misappropriation. As relevant here, the district court—without hearing oral argument—granted Integrated Logistics' motion for summary judgment on WSI's trade secret claim. App. 442-448. Even though WSI had made clear in its briefing that its lawsuit was based on the total duplication of its software, including the report generation, shipment data processing features, and functionality of the software, the court's summary judgment order incorrectly stated that WSI was basing its claim only on

15

"the visible output of Intelligent Audit (i.e., the screen displays customers interact with while running the program)." App. 441. The court's entire analysis rests on this misunderstanding, which led the court to frame the case as one for misappropriation of the "screen displays." App. 442-443.

In analyzing whether "screen displays" could be a trade secret, the District Court relied on two out-of-circuit cases not cited or discussed by either party. App. 443 (citing *IDX Sys. Corp. v. Epic Sys. Corp.,* 285 F.3d 581, 584 (7th Cir. 2002), and *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 221 (2010)). These cases involved duplication only of the *visual* elements of software programs and, unlike the present case, involved software programs that were not protected by end-user confidentiality agreements. App. 442-443. Also unlike the present case, the out-of-circuit cases involved duplication of information available to ordinary end users, whereas the present case involved misappropriation made possible by Defendants' high-level administrative access. WSI had never had an opportunity (until this appeal) to distinguish those cases or to point to record evidence showing how those cases were inapposite given the specific facts at issue here.

In addition to misidentifying WSI's trade secret claim and therefore relying on factually irrelevant cases, the district court took on the role of fact finder,

16

expressly "conclud[ing]" for itself that WSI's confidentiality measures were not reasonable:

> While there is some evidence that the defendants required users to sign a confidentiality agreement, . . . there is no evidence that Warehouse Solutions required the defendants to sign a confidentiality agreement. The only efforts actually taken by Warehouse Solutions to maintain the secrecy involved a verbal warning and requiring customers to access the system with a username and password.  In light of the self-revealing nature of the alleged trade secret, ***the court concludes*** these efforts were not reasonable to keep the information secret.

App. 446-447 (emphasis added).

Rather than determining whether a reasonable jury could have determined that the numerous steps WSI took to preserve its product's secrecy (*see supra* pp. 13-17) were reasonable under the circumstances, the district court made that decision itself, and in doing so selectively ignored the confidentiality requirements of the end-user license agreements, the security protocols implemented by WSI, WSI's requirement that it authorize individual user accounts, WSI's lack of sophistication and small size, and WSI's statements to Integrated Logistics—corroborated by the sworn admissions of its executives—that WSI's technology was confidential and proprietary.

17

## III.    STANDARD AND SCOPE OF REVIEW

The grant or denial of summary judgment is reviewed de novo. *B&G Enters., Ltd. v. United States*, 220 F.3d 1318, 1322 (11th Cir. 2000); *Thornton v. E.I. Du Pont de Numours & Co.*, 22 F.3d 284, 288 (11th Cir. 1994).    Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  *Whatley v. CNA Ins. Co.*, 189 F.3d 1310, 1313 (11th Cir. 1999).  The court must view all evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *St. Charles Foods, Inc. v. America's Favorite Chicken Co.*, 198 F.3d 815, 819 (11th Cir. 1999).

## IV.    SUMMARY OF THE ARGUMENT

The district court should have denied Integrated Logistics' summary judgment motion regarding WSI's trade secret claim, because there are at the very least genuine issues of material fact regarding whether Intelligent Audit's data and report generating functionality constitutes a trade secret and whether the many steps WSI took to protect the product's secrecy were reasonable under the circumstances.  Instead, the district court improperly usurped the role of the jury, misunderstood WSI's technology and the nature of its trade secret claim, made incorrect factual findings, and relied on clearly distinguishable cases.

18

The district court's errors focused on two elements of WSI's claim. First, the District Court expressly "concluded" for itself that WSI failed to employ reasonable measures to protect the confidentiality of its software. App. 447 ("***the court concludes*** these efforts were not reasonable to keep the information secret"). That was error in itself. Moreover, the District Court's factual conclusions were not supported by the record in any event: the Court erroneously stated that the "only" confidentiality measure undertaken by WSI was a "verbal warning" and passwords. App. 446-447. But taking the record in the light most favorable to WSI, the court should have considered the numerous other confidentiality measures employed by WSI to protect its software. The district court also failed to account for WSI's lack of size and legal or business sophistication at the time it entered into the agreement with Integrated Logistics. These improper findings resulted in a holding requiring a confidentiality agreement, contrary to clear Georgia case law holding that written confidentiality agreements are not required to find the existence of a trade secret.

Second, the District Court ignored the fact that Integrated Logistics copied the *functional* aspects of Intelligent Audit, and instead focused only on the "visible output" that was copied, thereby failing to consider WSI's trade secret claim in total. WSI's claim rests on Integrated Logistics' use of its enhanced access to copy

19

not only "visible output," but also the data and data-processing functionality that is not accessible to ordinary users and that Integrated Logistics could only reach through its enhanced access.  Such information easily falls within the Georgia Uniform Trade Secrets Act's definition of "trade secret," as then-Chief Judge Carnes correctly recognized in *AirWatch LLC v. Mobile Iron, Inc.*, 2013 U.S. Dist. LEXIS 125817 (N.D. Ga. Sept. 4, 2013).  In ruling otherwise, the District Court relied on two inapposite, out-of-circuit cases not cited or briefed by either party. Those cases were distinguishable: each involved defendants that duplicated only the *visible* elements of software programs and technology that was not protected by end-user confidentiality agreements, whereas this case, involves misappropriation of data and functionality not evident to the general public or even to customers with user IDs and passwords, but rather was available only to Integrated Logistics through its high-level administrative access.

The result of these errors was a dismissal that exceeded the district court's role, was unsupported by the record, and was contrary to law.  Practically speaking, the District Court opinion holds that software functionality and output cannot be protectable as trade secrets, even where that software is protected behind password requirements, provided only to customers who sign strict confidentiality agreements, and is the subject of layers of technological protection from

unauthorized users. In other words, the opinion holds that confidential features like a program's data processing and report generating structures—which are not visible to end users—can be duplicated with impunity, even if the owner takes reasonable steps to protect their secrecy.  That ruling is legal error and bad policy, and this Court should reverse it.

## ARGUMENT AND CITATIONS OF AUTHORITIES

**I. WSI presented sufficient evidence to create a jury question as to the reasonableness of its efforts to maintain confidentiality.**

**A. Georgia law is clear that a trade secret's existence is a factual question and may be found even absent a written confidentiality agreement.**

The Georgia Uniform Trade Secrets Act ("GUTSA") provides a civil remedy for the misappropriation of trade secrets. O.C.G.A. § 10-1-760 *et seq.* To state a claim, a plaintiff must allege that: (1) it possessed a trade secret, and (2) the defendant misappropriated the trade secret. *Penalty Kick Mgmt. Ltd. v. Coca Cola Co.*, 318 F.3d 1284, 1290-91 (11th Cir. 2003). The GUTSA requires that a trade secret be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." O.C.G.A. § 10-1-761(4).

Whether a particular type of information constitutes a trade secret is a question of fact. *See Salsbury Labs., Inc. v. Merieux Labs., Inc.*, 908 F.2d 706, 712 (11th Cir. 1990) (citing *Wilson v. Barton & Ludwig*, 163 Ga. App. 721, 296 S.E.2d 74, 78 (1982)). Whether sufficient efforts to maintain secrecy exist in a particular case is also a question of fact. *See, e.g., Sheets v. Yamaha Motors Corp.*, 849 F.2d 179, 183 (5th Cir. 1988); *Tri-Tron International v. Velto*, 525 F.2d 432, 436 (9th Cir. 1975).

22

Importantly, trade secrets may be protected even in the absence of a written confidentiality agreement, *Thomas v. Best Manufacturing Corp.*, 234 Ga. 787, 789, 218 S.E.2d at 71 (1975), and will be protected "so long as competitors fail to duplicate them by legitimate, independent research." *Id.*; *see also Salsbury*, 908 F.2d at 710 (following *Thomas*). "[O]ne who, by reason of confidential business relations with the discoverer, has gained possession of his trade secret, will be restrained by a court of equity from betraying the trust reposed in him by using the [knowledge thus acquired] for his own gain." *Outside Carpets v. Indus. Rug Co.*, 228 Ga. 263, 268 (1971).

### B. The District Court erred in concluding for itself that WSI's efforts to maintain secrecy were not reasonable under the circumstances.

The district court's analysis of WSI's efforts to maintain secrecy is cursory, consisting of only two paragraphs. App. 446-447. The court found that "there is no evidence that Warehouse Solutions required the defendants to sign a confidentiality agreement." App. 446. The court then stated that "[t]he only efforts actually taken by Warehouse Solutions to maintain the secrecy involved a verbal warning and requiring customers to access the system with a username and password." App. 446-447. Then, the court summarily "concluded" for itself that WSI's efforts to maintain secrecy were not reasonable. App. 447.

23

In these two brief paragraphs, the District Court erroneously placed itself in the role of the jury, and in so doing, misstated the evidence in a manner that favored the *moving* party, Integrated Logistics.  Specifically, the court (1) failed to account for numerous confidentiality measures specifically set forth in the record and briefing, and (2) failed to acknowledge WSI's infancy and unsophistication at the time it began dealings with Integrated Logistics.  Not only was this fact-finding in error and beyond the proper role of the court, but the end result was a ruling that can only be construed as requiring a written confidentiality agreement, as a matter of law, as a prerequisite for trade secret protection.  This result contradicts well-established Georgia law.  At a minimum, WSI presented sufficient facts to create a jury question as to the reasonableness of its efforts to maintain the secrecy of its software.

### 1.  The District Court erroneously usurped the role of the jury.

On pages 21 and 22 of the summary judgment order, the District Court stated as follows:

> While there is some evidence that the defendants required users to sign a confidentiality agreement, . . . there is no evidence that Warehouse Solutions required the defendants to sign a confidentiality agreement. The only efforts actually taken by Warehouse Solutions to maintain the secrecy involved a verbal warning and requiring customers to access the system with a username and password. In light of the self-revealing nature of the alleged trade secret, ***the court***

24

> ***concludes*** these efforts were not reasonable to keep the information
> secret.

App. 446-447 (emphasis added). In this paragraph, there can be no question that the District Court weighed the evidence, and as a result of that exercise, reached the conclusion that WSI's efforts to maintain secrecy were not reasonable under the circumstances. But the reasonableness of such efforts is unquestionably a factual issue for the jury. *See, e.g., Sheets v. Yamaha Motors Corp.*, 849 F.2d 179, 183 (5th Cir. 1988); *Tri-Tron International v. Velto*, 525 F.2d 432, 436 (9th Cir. 1975). Accordingly, the court should not have reached its own "conclu[sion]" regarding the factual issue, but should have determined that the record allowed a reasonable jury to resolve that issue in WSI's favor.

Indeed, as the record shows, a reasonable jury certainly could conclude that WSI's efforts to preserve the confidentiality of its product's data and report generation functionality were sufficient under the circumstances to warrant trade secret protection.

### 2. The District Court ignored the confidentiality measures implemented by WSI.

Not only was the District Court wrong to reach its own factual "conclu[sion]," but its fact finding was not supported by the record. Specifically, the District Court was incorrect in finding that "[t]he only efforts actually taken by

Warehouse Solutions to maintain the secrecy involved a verbal warning and requiring customers to access the system with a username and password." App. 446-447.

Rather, as WSI explained in its summary judgment opposition, WSI took many measures to maintain the confidentiality of the software:

- Only authorized users were given access to the software.

- Each authorized user was given a specific account that was set up by WSI specifically for that user.

- Authorized users were required to create "strong" passwords consisting of a variety of letters and numbers, and these passwords expired and required renewal.

- WSI monitored each user's log-ins into the system.

- WSI did not allow end users access to the data in the system.

- WSI did not allow end users to request large reports.

- WSI required its customers, as well as the customers of Integrated Logistics, to sign confidentiality agreements prior to accessing the software.

- WSI instructed Integrated Logistics to maintain the confidentiality of the software, and Integrated Logistics understood this instruction.

26

App. 276-280.  Indeed, Integrated Logistics' president David Ivie **admitted** that he considered the software to be confidential and proprietary:

> Q: Would you consider [WSI's software] confidential information?
> A: Yes.
> Q: Okay.  And would you consider it proprietary?
> A: Yes.

App. 276-280 (citing Ivie Dep. App. 271).

The types of secrecy measures WSI adopted are exactly the types of measures cited by courts to find that efforts to maintain secrecy *were* reasonable under the circumstances.  For example, in *Avnet, Inc. v. Wyle Labs.*, 437 S.E.2d 302, 304 (Ga. 1993), the Supreme Court of Georgia held that the trial court was reasonable in granting a preliminary injunction on the basis that the plaintiffs had made a reasonable effort to maintain secrecy because "the customer lists were not freely or widely disseminated and . . . certain employees to whom the information contained in the lists had been disclosed were required to sign agreements to keep the information secret."  In *Avnet*, there was no question that some employees were *not* required to sign confidentiality agreements, and in fact, the record evidenced fewer secrecy measures than those undertaken in the present case.  Yet, the fact that the information at issue was not widely disseminated, combined with selective use of confidentiality agreements, was deemed sufficient for a trial court to grant a

27

preliminary injunction under the GUTSA.

Similarly, in *Camp Creek Hospitality Inns v. Sheraton Franchise Corp*., 139 F.3d 1396, 1411 (11th Cir. 1998), this Court reversed a summary judgment ruling against a trade secret misappropriation claim where the information at issue was exchanged between the parties pursuant to an "apparently mutual understanding that it would be kept confidential." The Court's opinion does not indicate that any written confidentiality agreement existed, nor were any other security measures discussed in the opinion. Based solely on plaintiff's demonstration that the information at issue was the subject of an "*apparently mutual understanding*" that it remain confidential, this Court held that "[w]hether [the plaintiff's] efforts to keep the information secret in this case were 'reasonable under the circumstances' presents a question for the trier of fact." *Id.* at 1411 (emphasis added).

*Avnet* and *Camp Creek* show that minimal secrecy measures, including an "understanding" regarding secrecy or limited use of confidentiality agreements can be sufficient to find the existence of a trade secret for purposes of entering an injunction, or at a bare minimum creating a jury issue. By ruling otherwise, the district court essentially held that a written confidentiality agreement is ***required***, as a matter of law, in all Georgia trade secret cases, contrary to the holdings of the Georgia Supreme Court and this Court. *See Thomas,* 234 Ga. at 789; *Salsbury,*

28

908 F.2d at 710. WSI's evidence is at least comparable to, if not stronger than, the evidence in *Avnet* and *Camp Creek*, and WSI should have been allowed to present it to a jury.

### 3. The District Court failed to acknowledge WSI's infancy and unsophistication at the time it began dealings with Integrated Logistics.

Additionally, WSI argued below—and would have argued to the jury if given the chance—that its small size and lack of sophistication should bear on what measures might be "reasonable under the circumstances." App. 164-166. Although the Eleventh Circuit has not specifically addressed this issue before, WSI cited to the leading treatise on trade secret law for the following common-sense approach:

> The nature and character of the vigilance required of the owner to protect secrecy varies, depending upon a variety of factors. Among things to be considered are the size and character of the enterprise (generally, large, sophisticated enterprises are held to a higher "secrecy effort" standard) . . . and the nature and character of the enterprise's staff.

1-1 MILGRIM ON TRADE SECRETS § 1.04

In this case, at the relevant time, WSI was a tiny, family-run business comprised of three people. It did not have counsel, and it was managed by a recent immigrant with limited understanding of the law and limited resources. Mr. Lebovich, understandably, did not understand the particulars of trade secret law.

29

However, what he did understand was how to maintain confidentiality by using technological measures – which he did in every manner possible. If there ever were a situation where a reasonable jury could find that a written confidentiality agreement was not required under the particular circumstances, it would be in the present case. The district court was instead entirely silent on this issue.

## II.    Software features and functionality may be protectable trade secrets.

### A. Software functionality and features may qualify for trade secret protection.

Although there is no dispute that software **source code** may qualify as a trade secret, this case presents one of first impression in the Court by asking whether software **functionality and features** also may qualify as trade secrets if they are kept sufficiently confidential. WSI respectfully submits that such software features clearly fall under the GUTSA's definition of a "trade secret":

> information, without regard to form, including, but not limited to, technical or nontechnical data, a formula, a pattern, a compilation, a program, a device, a method, a technique, a drawing, a process, financial data, financial plans, product plans, or a list of actual or potential customers or suppliers which is not commonly known by or available to the public and which information:
>
> (A) Derives economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use . . . .

O.C.G.A. § 10-1-761(4) (emphasis added).

30

At least one Northern District of Georgia opinion has answered that question in the affirmative, and WSI urges this Court to adopt and apply that same common-sense approach.

In *AirWatch LLC v. Mobile Iron, Inc.*, 2013 U.S. Dist. LEXIS 125817 (N.D. Ga. Sept. 4, 2013), decided by then-Chief Judge Carnes, the defendant argued (much as Integrated Logistics did below) that "because AirWatch makes its product available to consumers, the program's capabilities are by definition 'readily ascertainable' and therefore cannot be trade secrets." *Id.* at *10. The *Airwatch* plaintiff responded that its customers were required to sign end-user license agreements (EULAs) that contained confidentiality obligations, and that those EULAs rendered the design and functionality of the *AirWatch* software protectable as a trade secret. *Id.* at *11-12.

The court in *Airwatch* saw no reason to hold that software functionality could not constitute a trade secret if protected by secrecy measures. Rather, the court held that "the disclosure of the program's specifications to those users [who signed EULAs] does not *per se* forfeit the program's trade secret status" and denied a motion to dismiss. *Id.* at *13-14. *AirWatch* thus rejected the argument—adopted by the district court in this case—that software functionality and features

31

cannot be a protectable a trade secret even if they were sufficiently secret, unless the underlying source code was not copied.

In this case, the district court purported to distinguish *AirWatch*, first noting that in *AirWatch*, "the nature of the plaintiff's product . . . is not such that a typical user of the software would be exposed to the software's capabilities by using the program." Dkt. 180 at 19; App. 444 (citing *AirWatch* at *4). The district court then attempted to differentiate the WSI software, stating that "dissemination of Intelligent Audit necessarily reveals the information Warehouse Solutions alleges to be secret, i.e., the visible output of the software program." App. 444-445.

The district court's conclusion is incorrect for two reasons. First, Integrated Logistics misappropriated information well beyond the "visible output" of the system. Specifically, Integrated Logistics had access to *every* customer account and *all of the <u>data</u>* associated with those accounts. App. 120-121. End users, on the other hand, did not have the ability to run large reports or to see other customers' data. App. 112-123, 228 ¶12. Because Integrated Logistics could run large reports and get access to every customer's data, it was able to reverse engineer the data processing features of the software where a typical end user could not. Accordingly, Integrated Logistics had access to, and misappropriated, information that a "typical end user" never would be able to see.

32

Second, and most importantly, the *AirWatch* court did *not* rule that the functionality of the AirWatch software was *inaccessible* to the end user, only that those functions might require *explanation.* In particular, the *AirWatch* opinion clearly stated that the total functionality of the software *was* accessible to the end user, and "might be clearer once an AirWatch sales representative explained the product to the customer." 2013 U.S. Dist. LEXIS 125817, at *16. Thus, both *Airwatch* and the present case involve software with complicated functions that require training and explanation to fully understand and operate. There was no basis for the district court to distinguishing *AirWatch* from this case.[2]

WSI respectfully submits that *AirWatch* is well-reasoned and correctly interprets the GUTSA's broad scope in protecting trade secrets, including software functionality and design that is not reasonably ascertainable by proper means if the software is sufficiently confidential and limited in distribution.[3] At the very least,

---

[2] The district court in this case relied on dicta in *AirWatch* in which the court "also note[d]" that the software had some functions not evident to end users. App. 444. But that observation only came after the *AirWatch* court's ruling denying the motion to dismiss, and accordingly was not essential to the holding.

[3] *AirWatch* is not the only case suggesting that software features and functionality may be protectable as trade secrets. *See, e.g.*, *Deman Data Sys., LLC v. Schessel*, No. 8:12-cv-2580, 2014 WL 6751195, at *21 (M.D. Fla. Dec. 1, 2014) (denying motion for summary judgment on trade secret misappropriation claim where plaintiffs adequately identified "their proprietary software" and "their confidential data . . . stored within . . . their proprietary software" as trade secrets); *TouchPoint*

33

this is a question that should be resolved by the jury based on the particular facts of this case.

## B. The District Court's cited authorities are inapposite.

Notably, Integrated Logistics did not cite any cases or make any substantive argument relating to the protectability of software features and functionality, nor did Defendants assert that whether particular information was or was not apparent to an end user was relevant to whether that information could be a trade secret. Rather, Integrated Logistics' summary judgment brief made only a passing reference construing WSI's position as one arguing for protection of the software's report generation capabilities and its Graphic User Interface, or the "look and feel" of "screenshots."  App. 78. WSI corrected that mischaracterization of WSI's trade secret in its opposition, repeatedly explaining that its trade secrets were more properly characterized as the "functionality, user interface, detailed report generation features, and report formatting."  App. 290-291; *see also* App. 282, 287 (also noting that the trade secret was the functionality of the software and end-user reports).

It was the district court's decision – not Integrated Logistics – that first

---

*Solutions, Inc. v. Eastman Kodak Co.*, 345 F. Supp. 2d 23, 28 (D. Mass. 2004) ("the overall design of software can constitute a trade secret").

34

articulated the arguments that (1) software functionality was not protectable, and (2) software details apparent to "ordinary users" of the software could not be protectable. Indeed, Integrated Logistics neither cited nor relied on the two cases cited by the District Court in support of its holding. Accordingly, this appellate brief is WSI's first opportunity to address the cases and analysis introduced and relied upon by the District Court. As it turns out, neither of the court's cases is apposite, let alone persuasive in the context of this record.

First, the District Court cited *IDX Sys. Corp. v. Epic Sys. Corp.,* 285 F.3d 581, 584 (7th Cir. 2002), for the proposition that "details that ordinary users of the software could observe without reverse engineering" are not trade secrets. App. 443. However, this truncated assessment of *IDX* fails to evaluate the court's analysis in that case, and also fails to account for some striking differences between *IDX* and the present matter.

First, in *IDX,* to the extent the court discussed the visible output of the software, the opinion is silent as to whether the confidentiality of that visible output was protected in any manner whatsoever. *See IDX,* 285 F.3d at 582-84. The case does not mention any security protocols or passwords required of end users of the software, nor do the facts make any mention of end-user confidentiality agreements. *See id.* Accordingly, when the court was discussing

35

"ordinary users" of the software, those users certainly do not appear to have been bound by the layers of security and confidentiality protocols that were utilized by WSI in this case. *See supra* pp. 13-17.

Moreover, the *IDX* court provided only one example of what it did not believe to be a trade secret – "the appearance of data-entry screens," which the court noted were "things that any user or passer-by *sees at a glance*." 285 F.3d at 584 (emphasis added). Here, by contrast, WSI identified not only the *appearance* of the software screens, but the entire manner and means of processing data, as well as the functionality itself. Ivie Dep. at Dkt. 170 pp. 112-114, 130. These are not features that are "seen at a glance," but rather the entire means and manner by which the software derives its usefulness.

Finally, the analysis in *IDX* is limited to the information that "***any*** user" or that "***ordinary*** users" could see. 285 F.3d at 584 (emphasis added). In the present case, Integrated Logistics was no "ordinary user[]"; rather, it was only able to reverse engineer the WSI software by virtue of its high-level administrative access enjoyed by no other user outside WSI.

*IDX* therefore cannot reasonably be construed to hold that only the algorithms or source code of software can be protectable as a trade secret. *IDX,* properly construed, stands for the proposition that the appearance of screenshots

36

generated by software *and* both (a) not protected by end-user confidentiality measures *and* (b) apparent to "ordinary users" of the software are typically not entitled to trade secret protection.  Its holdings have no bearing here.

The District Court next relied on a case from California's intermediate appellate court, which held that the design of a program cannot be a trade secret if it is "evident to anyone running the finished program."  App. 443  (quoting *Silvaco Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 221 (2010)).  *Silvaco* involved a complicated alleged trade secret that the court itself acknowledged was "technical verbiage most of which may be readily intelligible only to those within the EDA field."  *Silvaco*, 184 Cal. App. 4th at 221.  The *Silvaco* court then determined that the "technical verbiage" amounted to "various features, functions, and characteristics of the design and operation of Silvaco's software products" that the court ruled, without analysis or citation, "cannot constitute trade secrets because they are not secret, but are evident to anyone running the finished program."  *Id.* at 221-222.

As in *IDX*, *Silvaco* makes no mention of any measures to protect the confidentiality of the *Silvaco* software features.  The lack of discussion to that effect strongly implies that the software was available for purchase by any interested consumer, and that those consumers were not required to sign

37

confidentiality agreements or set up passwords.  Similarly, *Silvaco* is silent as to any security measures taken to protect the software from outside use.  In fact, it appears likely that the *Silvaco* software was purchased as a stand-alone, physical software product that could be distributed freely once purchased, as opposed to WSI's web-based software that was accessible only to authorized, password-issued users.

Also like *IDX*, *Silvaco* involved the duplication of features and information "evident to ***anyone*** running the finished program" (*id.* at 222 (emphasis added))— a fact specifically quoted by the court below.  App. 443.  Yet, as noted above, Integrated Logistics was not just "anyone" running WSI's program, but rather a high-level administrator of the software with significantly higher access than any end user.

These distinctions are of critical importance in the present case.  Both the *IDX* and *Silvaco* courts were looking at software products that could be accessed by *anyone,* passed along to *anyone,* and studied by *anyone*.  The present case presents an entirely different issue: can a reasonable jury ***ever*** conclude that the design and underlying functionality of a web-based software program is protectable as a trade secret when the software is encrypted, accessible only to handful of authorized users, provided only to consumers who sign strict

38

confidentiality agreements, protected by passwords, totally unavailable outside these parameters, and acknowledged as confidential by the defendants who copied it through extraordinary access?   Neither *IDX* nor *Silvaco* answers that question, and therefore they are neither instructive nor persuasive.   *AirWatch* - which expressly distinguished *IDX* and *Silvaco* (*see* 2013 U.S. Dist. LEXIS 125817, at *12) - is on-point and well-reasoned, and this Court should reach the same result here.

## CONCLUSION

For the foregoing reasons, the district court's summary judgment order should be reversed.

Respectfully submitted this 12th day of January, 2015.

/s Amanda G. Hyland
Todd E. Jones
Georgia Bar No. 403925
tjones@taylorenglish.com
Amanda G. Hyland
Georgia Bar No. 325115
ahyland@taylorenglish.com
Seth K. Trimble
Georgia Bar No. 851055
strimble@taylorenglish.com

TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339
Telephone: 770-434-6868
Facsimile: 770-434-7376
Attorneys for Appellant

## CERTIFICATE OF COMPLIANCE

1.     This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 8,126 words, excluding the parts of the Brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     This Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because counsel prepared it using plain, Roman style, with exceptions for case names and emphasis, and using Time New Roman 14-point type, which is a proportionately spaced font, including serifs.

Respectfully submitted this 12th day of January, 2015.

/s Amanda G. Hyland
Todd E. Jones
Georgia Bar No. 403925
tjones@taylorenglish.com
Amanda G. Hyland
Georgia Bar No. 325115
ahyland@taylorenglish.com
Seth K. Trimble
Georgia Bar No. 851055
strimble@taylorenglish.com

TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339
Telephone: 770-434-6868
Facsimile: 770-434-7376
Attorneys for Appellant

41

## CERTIFICATE OF SERVICE

In accordance with Federal Rule of Appellate Procedure 25(a)(2)(B), I hereby certify that I have this day served the foregoing Brief of Appellant Warehouse Solutions, Inc. by causing a true copy to be deposited in the U.S. Mail, proper postage prepaid, addressed to all parties as follows:

Angela H. Smith
Carey E. Olsen
Alexander T. Galloway
J. Marshall Wehunt
Moore Ingram Johnson & Steele, LLP
Emerson Overlook
326 Roswell Street
Marietta, GA 30060

Nicholas R. Perrella
Law Offices of Nicholas R. Perrella
6040 Boulevard E Suite 23-C
West New York, New Jersey 07093

This 12th day of January, 2015.

/s Amanda G. Hyland
Todd E. Jones
Georgia Bar No. 403925
tjones@taylorenglish.com
Amanda G. Hyland
Georgia Bar No. 325115
ahyland@taylorenglish.com
Seth K. Trimble
Georgia Bar No. 851055
strimble@taylorenglish.com

TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 400
Atlanta, GA 30339
Telephone: 770-434-6868
Facsimile: 770-434-7376
Attorneys for Appellant